UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TERENCE HOLLOWAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:06CV1235 CDP |
| | ) | |
| CORRECTIONAL MEDICAL | ) | |
| SERVICES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

When plaintiff Terence Holloway entered the Missouri Department of

Corrections in 2003, he had been infected with the hepatitis C virus (HCV) for

many years, most likely as a result of his many years of intravenous drug use.

When he entered prison he inquired about being placed on interferon drug

treatment, although he had not been given that treatment before his incarceration.

In this suit brought under 28 U.S.C. § 1983 and other statutes, Holloway alleges

that prison administrators and prison medical providers were deliberately

indifferent to his serious medical needs because they did not provide interferon

treatment until 2007.  Before that time, they told him he was required to complete

a prison drug treatment program before he could be given interferon treatment,

but, he alleged, they refused to place him in such a program.  Eventually, the

prison changed its protocols, and he was provided the interferon treatment even though he never completed the prison drug treatment program.

Holloway filed this lawsuit under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA) against several defendants, including his prison treating physicians and nurses; prison officials who reviewed his grievances and requests for treatment; Correctional Medical Services, a corporation that contracts with the Missouri Department of Corrections to provide healthcare services to inmates; and the Missouri Department of Corrections. All defendants have filed motions for summary judgment, and the undisputed evidence shows that there are no genuine disputes of material fact and defendants are entitled to judgment as a matter of law.

Holloway was released from prison while this case was pending. After the motions for summary judgment were fully briefed, Holloway was killed in a car wreck. Holloway's appointed counsel located his next of kin, and I entered an order informing them that unless a duly appointed personal representative filed a motion for substitution by January 25, 2010, the case would be dismissed without prejudice. On January 26, new counsel entered an appearance for "plaintiff" and sought an extension of time to file a motion for substitution of the personal representative. I granted that request, and allowed additional time, until February 26, 2010. That date came and went, and nothing was filed. Because the

undisputed evidence shows that defendants are entitled to summary judgment, there is no reason to delay this case further in hopes that a personal representative will file a motion for substitution.  I will therefore grant summary judgment to all defendants,  for the reasons that follow.

## Background and Undisputed Facts

Terence Holloway began using drugs intravenously in the 1970s, and was most likely infected with HCV sometime in the 1980s.  He was diagnosed with the virus in 1994.  Holloway continued to use drugs intravenously until early 2003, when he successfully completed a Chemical Dependency Intensive Outpatient Program at Barnes-Jewish Hospital.  He also had treatment in 2002 for depression and other mental heath issues.  In March 2003, Holloway was imprisoned within the Missouri Department of Corrections after his conviction on a state offense.

### A.  Interferon Treatment

In 2001, pegylated-interferon and ribavirn became available to treat HCV. Interferon treatment has significant side effects, however, including influenza-like symptoms, hematologic abnormalities, and neuropscyhiatric symptoms.  Patients with mental health issues can have serious reactions to the treatment, including severe depression.  The National Institutes of Health issued a consensus statement for interferon treatment in 2002, declaring that all "patients with chronic hepatitis C are potential candidates" for interferon treatment.  However, the NIH Consensus

Statement also cautioned, in "some patient populations, the risks and benefits of therapy are less clear and should be determined on an individual basis."  Similarly, the 2003 Federal Bureau of Prison Guidelines for the Prevention and Treatment of Viral Hepatitis recommended that inmates "diagnosed with acute hepatitis C . . . be considered for antiviral therapy," but cautioned that, because "the timing and optimal treatment regimen . . . are uncertain, . . . treatment decisions should be made on a case-by-case basis."

The FBOP Guidelines also provided that inmates "with a history of psychiatric illness . . . should be referred to a psychologist or psychiatrist for assessment," and listed a "[h]istory of recent alcohol abuse or illicit drug usage" as a relative contraindication."  Finally, the NIH Consensus Statement stated that the side effects of treatment include "neuropsychiatric symptoms."  The FBOP Guidelines also provided that "[s]evere and incapacitating depression can occur" as a side effect of the treatment.

Correctional Medical Services adopted the FBOP Guidelines for treatment of HCV during the relevant times for this lawsuit.

### B.  Holloway's Medical Treatment

When Holloway was imprisoned within the Missouri Department of Corrections in 2003, he was evaluated by CMS personnel, who enrolled Holloway in the hepatitis chronic care clinic to treat his HCV.  In the clinic, Holloway's

- 4 -

alanine aminotransferase (ALT) levels were tested to evaluate the progression of his HCV. Although the severity of an HCV infection and its effects on the liver are unpredictable, ALT level fluctuations can indicate lever disease.

In May 2003, Holloway was transferred to the Southeast Correctional Center (SECC), where he was evaluated by Dr. Babich, who enrolled Holloway in the SECC hepatitis chronic care clinic. At this clinic, Dr. Babich and other CMS staff monitored Holloway's hepatitis through lab studies, including liver enzyme testing; physical examinations; and education and counseling on the prevention and risks of HCV. Based on his own observations of Holloway and the FBOP guidelines, Dr. Babich determined that Holloway was not eligible for interferon treatment, because of his prior drug use and his history of mental depression. Dr. Babich informed Holloway that he needed to complete a drug treatment program before he could be eligible for interferon. From May 2003 until Holloway was transferred to another institution in October 2004, Dr. Babich continued to monitor Holloway's HCV in the hepatitis chronic care clinic, including by evaluating Holloway's ALT levels. Dr. Babich also treated Holloway's other medical needs, including a broken needle in Holloway's arm.

In October 2004, Holloway was transferred to the Northeast Correctional Center (NECC), where he was treated in the hepatitis chronic care clinic. Like Dr. Babich before him, Dr. Rakestraw determined that Holloway was not eligible for

interferon, because Holloway had a history of drug use and had not completed a drug treatment program. Holloway was transferred to the Missouri Eastern Correctional Center in March 2005, where he was treated in the MECC hepatitis chronic care clinic by Dr. Williams and nurse Sally Cox for his HCV and other medical needs. Dr. Williams also determined Holloway was not eligible for interferon treatment because of the contraindications to treatment.

In December 2005, Dr. Conley, CMS Regional Medical Director, determined, based on new FBOP Guidelines and other evolving community standards for treating HCV, that inmates should be eligible for interferon treatment, even if they do not complete a drug treatment program. Based on this new standard, Dr. Williams determined Holloway was eligible for interferon treatment and changed Holloway's medical classification from an M-2 to a M-4. A change in an inmate's medical classification can sometimes require that the inmate be transferred to a different MDOC institution with proper medical facilities capable of treating that inmate. In the interim between Holloway's medical classification change and his transfer in December 2006, Dr. Williams prepared Holloway for interferon treatment by ordering Holloway's liver biopsy, psychiatric clearance, genotype testing, and blood work.

In December 2006, Holloway was transferred to the Western Missouri Correctional Center (WMCC), which did not have medical facilities capable of

treating an M-4 inmate.  Soon afterwards, Holloway was transferred again to the Farmington Correctional Center, where he received interferon treatment and was cured of his HCV infection.  He was later released from prison in 2008.

## C.  Holloway's Grievances and Requests

In March 2004, Holloway wrote to Judy Hudson, a registered nurse and MDOC Director of Health Services, about the requirement that he complete drug treatment before being eligible for interferon treatment.  He informed Hudson that, before his incarceration in MDOC, he had been treated for drug use.  Hudson responded to Holloway's letter by stating that she forwarded it to Martha Nolin, Ph.D. and MDOC Assistant Director of Substance Abuse Services.  Holloway wrote Hudson again in May 2003, and she responded by saying that she had forwarded that letter to Dr. Nolin as well.

Holloway later applied for treatment in the Intensive Therapeutic Community, which had a small number of beds available for voluntary enrollment. He did not apply to other drug treatment education programs that would also have satisfied his drug treatment requirement.  Dr. Nolin reviewed Holloway's application and marked it "High priority," but Holloway was unable to enroll in the Intensive program.  Dr. Nolin did not control admission to this program, but reviewed applications for eligibility and placed them on the waiting list for the program.  Holloway later wrote to Senator Maida Coleman about the drug

treatment requirement, and Senator Coleman sent a request to MDOC Constituent Affairs asking that they look into Holloway's case. Lisa Jones, an MDOC Constituent Services Officer, reviewed the request and informed Holloway that the Missouri State Penitentiary, where Holloway believed he could receive drug treatment, could not accept transfers. Finally, Holloway wrote Jennifer Sachse, MDOC Associate Superintendent of MECC and the Americans with Disabilities Act Site Coordinator, and Vicki Myers, MDOC Director of the Division of Human Services, about the drug treatment program requirement. Both responded that his concerns did not present ADA issues.

In December 2005, Holloway submitted an Informal Resolution Request (IRR), in which he complained that he was denied adequate medical care for his HCV. Gale Wollberg, CMS MECC Director of Nursing, met with Holloway to discuss his IRR after having reviewed his IRR and medical records. At their meeting, Wollberg discussed Holloway's concerns with him and informed him that the standards for interferon treatment were evolving. Wollberg then determined that Holloway's medical concerns were being addressed. Holloway later filed an Offender Grievance, in which he reiterated his concerns about his medical care. Lori Young, CMS MECC Health Services Administrator, reviewed Holloway's grievance and medical records and determined that Dr. Williams had begun evaluating Holloway for interferon based on the new interferon treatment

guidelines. Young determined there was no basis for Holloway's grievance. Dissatisfied with Young's response, Holloway appealed his offender grievance, and Jewel Cofield, CMS regional manager, concluded after reviewing Holloway's records that there was no basis for his appeal.

### D. Procedural History

In August 2006, Holloway filed a *pro se* complaint against defendants, and counsel was later appointed to represent him. Holloway, through appointed counsel, filed his first amended complaint in November 2007. In Counts I and II, Holloway asserts claims against all defendants under 42 U.S.C. § 1983, claiming defendants violated his Eighth Amendment right to be free from cruel and unusual punishment by denying him interferon treatment. In Count III, Holloway contends defendants CMS and MDOC violated his rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* In Count IV and throughout his complaint, Holloway contends all defendants retaliated against him for filing grievances and this lawsuit by denying him medical care, delaying his transfer to a proper medical facility, transferring him to an incorrect facility, and placing him in administrative segregation. All defendants have moved for summary judgment. Holloway also moved for sanctions against MDOC, because MDOC failed to make any offer of settlement at the parties' court-ordered mediation.

While the parties' motions were pending, Holloway was killed in a car accident. I allowed his appointed counsel to withdraw, and notified the known relatives that a motion for substitution by personal representative would have to be filed by January 25, 2010. Although a lawyer entered an appearance on January 26, 2010, and I granted an additional month for someone to file a motion for substitution, nothing was filed by the extended deadline. Because it is clear that defendants are entitled to summary judgment, however, I will not delay the case further. Even if a personal representative was duly substituted as plaintiff, summary judgment would be granted, so there is no reason to beseech the survivors to file a motion to substitute.

## Discussion

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v Carrett*, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings but must set

forth by affidavit or other evidence specific facts showing that a genuine issue of material facts exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue of material fact. *Anderson*, 477 U.S. at 249.

## I. § 1983 Claims

All defendants first move for summary judgment on plaintiff's § 1983 claims. I will consider each group of defendants to determine whether there is a genuine issue of material fact as to defendants' liability.

## A. CMS Medical Staff

Holloway asserts that his treating physicians, Drs. Babich, Rakestraw, and Williams, and nurse, Sally Cox, were deliberately indifferent to his serious medical needs because they required him to complete a drug treatment program before he could receive interferon treatment. In response, defendants claim they made a sound medical judgment not to treat Holloway with interferon because of the presence of contraindications to treatment and the risks involved with treatment. Defendants also contend that the standards for HCV treatment are evolving, and that, contrary to Holloway's claims, they did in fact treat Holloway for his HCV, but decided that interferon treatment was not appropriate at the times he requested it.

An inmate's Eighth Amendment right to be free from cruel and unusual punishment is violated if prison officials are deliberately indifferent to the inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004). To prevail on a claim of deliberate indifference, a plaintiff must demonstrate both (1) that he suffered a serious medical need, and (2) that prison officials knew of but deliberately disregarded that need. *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009). Within the Eighth Circuit, a serious medical need is defined as "one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Jones v. Minnesota Dept. of Corrs.*, 512 F.3d 478, 481 (8th Cir. 2008) (internal quotation marks and citation omitted). A prison official displays deliberate indifference if she knows of and disregards an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Although the Eighth Amendment prohibits prison officials from being deliberately indifferent to the inmate's serious medical needs, "nothing in the Eighth Amendment prevents prison doctors from exercising their independent medical judgment," and prisoners "do not have a constitutional right to any particular type of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996). Accordingly, prison officials "do not violate the Eighth Amendment when, in the

exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Id.* Finally, a prison official's medical malpractice or negligence does not violate the Eighth Amendment, because only a knowing disregard of an excessive risk of harm to an inmate's health results in an Eighth Amendment violation. *Estelle*, 429 U.S. at 105-06; *see also Dulany v. Carnahan*, 132 F.3d 1234, 1240-41 (8th Cir. 1997) ("Grossly incompetent or inadequate care can constitute deliberate indifference in violation of the Eighth Amendment where treatment is so inappropriate as to evidence maltreatment or a refusal to provide essential care.") (citation omitted).

When, as here, a plaintiff contends that prison officials were deliberately indifferent because they did not provide prompt interferon treatment for the plaintiff's HCV infection, the issue is "not whether the infection itself is a serious medical need, but rather whether the inmate had a serious medical need for prompt interferon treatment." *Bender*, 385 F.3d at 1137 (internal quotation marks and citations omitted).[1] Because I determine that the uncontroverted evidence shows defendants did not act with deliberate indifference, I need not decide whether Holloway had a serious medical need for prompt interferon treatment. *Id.*

---

[1] The court in *Bender* ultimately did not decide whether an inmate with HCV has a serious medical need for interferon treatment under the Eight Amendment, because it held that the plaintiff in that case failed to prove the defendant doctor acted with deliberate indifference. *Bender v. Regier*, 385 F.3d 1133, 1137 (8th Cir. 2004).

Here, the undisputed evidence reveals that when Holloway was transferred to the MDOC Southeast Correctional Center in May 2003, defendant Dr. Babich evaluated him for possible interferon treatment, but determined that Holloway did not meet the established criteria for the treatment because of contraindications to treatment and risks involved. Specifically, Dr. Babich noted that Holloway had been an intravenous drug user for several decades and had prior issues with mental health, including depression. Because of this prior drug abuse history, Dr. Babich informed Holloway that he needed to complete a drug rehabilitation program before he could be eligible for interferon treatment. Over the following months until Holloway was transferred to another facility in October 2004, Dr. Babich continued to meet with Holloway and monitor his HCV infection by testing his ALT levels. Because Holloway did not complete a drug treatment program during these months, Dr. Babich determined that Holloway was still not a candidate for interferon treatment.

During the following months until December 2005, Holloway was transferred to several MDOC facilities where he was treated by defendants Drs. Rakestraw and Williams and nurse Sally Cox. At each institution, defendants treated Holloway's HCV infection in the hepatitis chronic care clinics by monitoring Holloway's ALT levels and educating him on the disease. Drs. Rakestraw and Williams, like Dr. Babich before them, determined Holloway was

not eligible for interferon until he completed a drug treatment program, based on their own observations and on the applicable interferon treatment guidelines.[2]

This decision was consistent with both the NIH and FBOP guidelines at the time. As mentioned above, the 2002 NIH Consensus Statement cautioned that, in "some patient populations, the risks and benefits of therapy are less clear and should be determined on an individual basis." Similarly, the 2003 FBOP Guidelines provided that, because "the timing and optimal treatment regimen . . . are uncertain, . . . treatment decisions should be made on a case-by-case basis." The FBOP Guidelines also stated that inmates "with a history of psychiatric illness . . . should be referred to a psychologist or psychiatrist for assessment," and lised a "[h]istory of recent alcohol abuse or illicit drug usage" as a relative contraindication." Both the FBOP Guidelines and the NIH Consensus statement listed depression as a potential side effect of treatment.

Essentially, Holloway takes issue with defendants' requirement that he complete a drug treatment program before he could receive interferon treatment. However, a "mere disagreement with the course of the inmate's medical treatment does not constitute an eight amendment claim of deliberate indifference." *Warren*

---

[2]Holloway also asserts that defendants' failure to monitor his ALT levels every six months constituted deliberate indifference, as the FBOP Guidelines provide that ALT levels should be monitored at least every three to six months when they are elevated. At most, this evidences defendants' negligence or malpractice, and it is insufficient evidence to make a claim for deliberate indifference. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).

*v. Fanning*, 950 F.2d 1370, 1373 (8th Cir. 1991) (internal quotation marks and citation omitted). Moreover, evidence adduced by Holloway supports defendants' decision. Specifically, Holloway's own expert, Dr. Bacon, concedes that, even if "everybody should be considered for treatment if they were Hepatitis C positive," the presence of contraindications might make the treatment inappropriate. Dr. Bacon also states that requiring a patient to seek drug treatment before undergoing interferon treatment is an acceptable method of treatment. Although Dr. Bacon might have treated Holloway with interferon, "showing that another physician might have ordered different tests and treatment does not show deliberate indifference." *Dulany*, 132 F.3d at 1242 (citations omitted).

Holloway also contends that he should not have been required to undergo drug treatment because he had successfully completed drug treatment before he was incarcerated, and he always tested negative for heroin while incarcerated. The evidence reveals however, that Holloway has used heroin and other illicit substances intravenously for around thirty years. Although he completed an outpatient program, his physicians at that program recommended that he continue his recovery by "participating in 3-5 Narcotics Anonymous meetings weekly, and having a sponsor," and Holloway has adduced no evidence that he complied with those recommendations. Plaintiff's own expert, Dr. Bacon, also testified at his deposition that he requires his patients to be abstinent from illicit drug use for six

months before he begins interferon treatment with them, and that the timing on

treating injection drug users with interferon "sort of depends on how much you

believe the person says they're not going to use substances anymore." Based on

this evidence, I cannot conclude that defendants were "grossly incompetent" by

requiring that Holloway attend a drug treatment program before treating him with

interferon. *See Dulany*, 132 F.3d at 1240-41.

Next, Holloway contends defendants should not have required him to

undergo treatment because the waiting lists for drug treatment programs at MDOC

were lengthy. But the record reveals that, although Holloway was first informed

by defendants in May 2003 that he would have to undergo drug treatment before

receiving interferon, he did not submit an application for drug treatment until

April 2004. Moreover, Holloway did not apply for enrollment in any inmate

education facilities that would have satisfied the drug treatment requirement.

Although the drug treatment and inmate education programs both had lengthy

waiting lists, Holloway adduces no evidence showing that defendants delayed his

treatment for any reason other than the presence of contraindications for treatment,

which Dr. Bacon agrees is a valid reason to delay treatment.[3]

---

[3]Holloway contends that, because CMS saved "itself twenty to thirty thousand dollars" by denying Holloway interferon treatment, CMS and CMS defendants had an incentive to deny treatment. While it is true that interferon treatment costs around twenty to thirty thousand dollars and that CMS did not have to pay that amount when because Holloway did not receive interferon between 2003 and March 2007, these facts alone do not establish that CMS or defendants considered cost in deciding not to treat Holloway. *See Dulany v. Carnahan*, 132 F.3d 1234, 1241

Finally, Holloway asserts that Dr. Williams was deliberately indifferent because Dr. Williams did not transfer Holloway to a facility capable of treating his level of medical status until February 2007, even though Dr. Williams determined in January 2006 that Holloway was a potential candidate for interferon treatment. The evidence does not support this argument. Indeed, the undisputed evidence shows that, aside from having the ability to change Holloway's medical score from an M-2 to M-4, CMS personnel like Dr. Williams had no control over transfers. It is also uncontroverted that Dr. Williams entered orders for Holloway's psychiatric evaluation, genotype testing, and blood work as soon as Dr. Williams determined that Holloway was a candidate for interferon. Rather than showing Dr. Williams's "deliberate indifference," gross incompetence, or intentional maltreatment, the evidence reveals that Dr. Williams treated Holloway's HCV by ensuring that all required tests for interferon were completed. *See Dulany*, 132 F.3d at 1240-41.

After reviewing the evidence, I conclude there is insufficient evidence for a jury to find that defendants were so grossly incompetent in delaying interferon treatment as to evidence "maltreatment" or a "refusal to provide essential care." *See Dulany*, 132 F.3d at 1240-41. Instead, the uncontroverted evidences shows that defendants made a medical judgment not to treat Holloway with interferon

(8th Cir. 1997) (affirming summary judgment in part because plaintiff's evidence "provide[d] no more than mere speculation about whether the prison officials acted with deliberate indifference, and speculation is not sufficient to survive a motion for summary judgment.").

based on the presence of contraindications to treatment. This decision is consistent with both the guidelines promulgated by the NIH and the FBOP, and with plaintiff's own evidence. Accordingly, Holloway fails to create a genuine issue of fact as to whether these defendants were deliberately indifferent, and they are entitled to summary judgment.[4] *See* Fed. R. Civ. P. 56(c); *Bender*, 385 F.3d at 1137-38 (reversing a district court's denial of summary judgment when prison physician offered evidence that he treated plaintiff's "medical needs including his HCV condition for many months" and withheld interferon treatment because, among other reasons, the physician "believed he lacked authority to order interferon treatment without a Department of Health protocol establishing eligibility criteria.")*; see also Iseley v. Beard*, 200 Fed. Appx. 1377, 141-42 (3d Cir. 2006) (affirming summary judgment against plaintiff with HCV when defendants made sound medical judgment to require plaintiff to undergo psychological treatment before he could receive interferon, and plaintiff refused to attend psychological treatment); *Richardson v. Blanchette*, No. 3:03CV1621 (AWT), 2006 WL 496010, at *11 (D. Conn. Mar. 1, 2006) (granting summary

---

[4]Because I determine that defendants were not deliberately indifferent to Holloway's medical needs, I need not discuss whether Holloway has satisfied his burden of placing "verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment." *See Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) (to prevail on a claim of deliberate indifference to medical needs because of a delay in medical treatment, plaintiff must place "verifying medical evidence" of delay's harmful effects); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986 ("[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

judgment for defendants on plaintiff's Section 1983 deliberate-indifference claim when defendants refused to treat plaintiff's HCV with interferon because of his uncontrolled diabetes, which is a contraindication for interferon).

## B.  CMS Supervisory Defendants

Holloway also brings § 1983 claims against defendants Dr. Conley, Gail Wollberg, Lori Young, and Jewel Cofield, asserting that they are liable in their supervisory roles because either they were personally involved in the violations, or  their "corrective inaction" amounted to deliberate indifference.  Defendants counter that they were not personally involved, and that the undisputed evidence shows that they reviewed each of Holloway's grievances and addressed them appropriately.

It is well settled that there is no respondeat superior liability under § 1983. *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995).  Accordingly, supervisory personnel are not liable under §1983 absent a showing that "the supervisor [was] personally involved in the violation" or that "the supervisor's corrective inaction constitute[d] deliberate indifference toward the violation."  *Id.* (citation omitted). In particular, the plaintiff must show that the supervisor knew about the conduct and facilitated it, approved it, condoned it, or turned a blind eye to it.  *Id.* (citations omitted); *see also Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997) ("Section

1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights.").

Here, Holloway first contends that Dr. Conley was personally involved in the alleged violation because, in her role as Regional Medical Director for CMS, she was in charge of formulating the criteria by which HCV patients would be evaluated for interferon treatment. In particular, Holloway alleges that Dr. Conley established criteria the fell below the accepted standards of care because she formulated the policy requiring inmates with a history of drug use to complete a substance program before they could be eligible for interferon treatment. However, as mentioned above, the evidence reveals that this requirement was consistent with the applicable standards of care, including the NIH Consensus Statement and the FBOP guidelines. It is also consistent with Dr. Bacon's testimony. Moreover, no evidence exists showing that the policy was unconstitutionally applied to Holloway, or that Dr. Conley had any role in treatment decisions for Holloway. *See id.* (supervisor incurs liability in section 1983 cases only "when the supervisor is personally involved in the violation").

As with Dr. Conley, there is no evidence that defendants Gail Wollberg, Lori Young, and Jewel Cofield were personally involved in Holloway's treatment. To show their liability, Holloway asserts instead that their corrective inaction amounted to deliberate indifference. The evidence belies that claim, however. In

December 2005, Holloway filed an informal resolution request with Gail Wollberg, stating that he was denied adequate medical care to treat his HCV. In response, Wollberg reviewed Holloway's medical records to see that he was enrolled in the hepatitis chronic care clinic, discussed his care with medical staff, and met with him to discuss his lab results and the changing HCV treatment protocols. She determined that Holloway's medical concerns were being addressed. Similarly, Holloway filed an offender grievance with Lori Young, in which he reiterated his concern about his HCV care. Young responded by reviewing Holloway's medical records, noting that Dr. Williams had already determined that Holloway was a candidate for interferon treatment based on the changing protocols. Holloway appealed his offender grievance to Jewel Cofield, who also noted that Dr. Williams was already evaluating Holloway for interferon treatment.

Rather than creating a genuine issue of material fact, this evidence shows that none of these defendants was personally involved in Holloway's treatment decisions, or took corrective inaction. *See Boyd*, 47 F.3d at 968. Accordingly, these defendants are entitled to summary judgment on Holloway's first amended complaint and will be dismissed from this action. *See* Fed. R. Civ. P. 56(c); *Boyd*, 47 F.3d at 968.

### C.  Missouri Department of Corrections Individual Defendants

Holloway next asserts that several employees of the Missouri Department of Corrections were deliberately indifferent to his serious medical need for interferon.  According to Holloway, these defendants were aware of his medical condition and need for treatment, but they failed to enroll him in a MDOC drug treatment program and failed to change the requirement that he complete a drug treatment program before he could receive interferon.  These MDOC defendants for summary judgment based in part on qualified immunity, asserting that they relied on Holloway's doctors' medical orders and had no personal involvement in Holloway's treatment decisions.

To begin with, I must dismiss Holloway's claims for monetary damages against these defendants in their official capacities, because those claims are barred by the Eleventh Amendment.  *See Nix v. Norman*, 879 F.2d 429, 432-33 (8th Cir. 1989) ("The Eleventh Amendment to the United States Constitution prohibits suits for damages against the state, agencies of the state or state officials acting in their official capacities.").  Holloway may bring claims for monetary damages against these defendants in their individual capacities, however.

As I mentioned, the MDOC defendants have asserted qualified immunity.  Qualified immunity shields government officials from § 1983 liability when their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether these defendants are entitled to qualified immunity, I must consider two questions: (1) whether the facts as shown, construed in the light most favorable to Holloway, establish that defendants violated Holloway's constitutional or statutory rights, and (2) whether the right was clearly established between May 2004 and December 2005, such that a reasonable official would have known that her actions were unlawful. *See Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part on other grounds by Pearson*, 129 S. Ct. at 818. Defendants are entitled to qualified immunity if no reasonable fact finder could answer both questions in the affirmative, and I may consider which of the two questions should be addressed first in light of the facts and circumstances of this case. *Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009) (citing *Pearson*, 129 S. Ct. at 818).

Because these MDOC individual defendants took no part in Holloway's direct medical treatment, Holloway must show that they were otherwise personally involved in the violation, or that their inaction amounted to deliberate indifference. *See Boyd*, 47 F.3d at 968; *see also Meloy v. Bachmeier*, 302 F.3d 845, 847-49 (8th Cir. 2002) (examining whether prison nurse was liable as a supervisor when she was the director of medical services at prison, but did not

examine or take care of patients herself). Prison officials are personally involved in an Eighth Amendment violation if they intentionally deny or delay access to medical care, or intentionally interfere with prescribed medical treatment. *Estelle*, 429 U.S. at 104-05; *Meloy*, 302 F.3d at 849. However, a defendant's "general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir.1995). Finally, if a prison official lacks medical expertise, she cannot be liable for the medical staff's medical treatment decisions. *See id.*

In an attempt to show these defendants were personally involved in the alleged violation, Holloway asserts that defendants failed to enroll him in requested drug treatments after he wrote them several letters describing his HCV infection and requesting enrollment. According to Holloway, he needed only to successfully complete a drug treatment program to be eligible for interferon treatment, and these defendants' failure to immediately enroll him amounted to deliberate indifference to his serious medical needs. This contention is refuted by the evidence.

As I detailed above, Holloway's physicians determined he was not eligible for interferon treatment for several reasons, including his histories of past drug use and depression. Morever, the record reveals that there were other drug treatment programs available that would have satisfied the drug treatment requirement to

which Holloway did not apply.  Most importantly, however, it is undisputed that

these defendants had no control over enrollment in the MDOC drug treatment

programs to which Holloway did apply.[5]  Specifically, inmates were enrolled in

this program by submitting an application, being interviewed, and waiting for the

next available slot if their application was approved.  A failure to enroll Holloway

in his requested treatment when defendants had no control over enrollment does

not establish deliberate indifference.  *See Estelle*, 429 U.S. at 104-5 (deliberate

indifference may be manifested when prison officials *intentionally* delay access to

medical care) (emphasis added).

Holloway's contention that defendants failed to assist him is also belied by

the record.  Defendant Judy Hudson, the Director of Health Services for MDOC,

responded to each of Holloway's letters requesting enrollment by forwarding his

request to Martha Nolin, Ph.D., Assistant Director in the Division of Offender

---

[5]In his response to defendants' motion for summary judgment, Holloway contends that
Dr. Nolin "had the corrective power to place Holloway in a [drug treatment] program."
Holloway cites no evidence to support that assertion, however, and there is no evidence in the
record before me to support it.  Rather, all the evidence reveals that Dr. Nolin had no power to
control who was admitted to the program, but instead could only coordinate the review of an
application to the program before the application could be placed on a waiting list.  A party
responding to a motion for summary judgment "may not rely merely on allegations or denials in
its own pleading," but must set forth by affidavit or other evidence specific facts showing that a
genuine issue of material fact exists.  FED. R. CIV. P. 56(e); *see also Putman v. Unity Health Sys.*,
348 F.3d 732, 733-34 (8th Cir. 2003) (to survive a motion for summary judgment, the
"nonmoving party must substantiate his allegations with sufficient probative evidence [that]
would permit a finding in [his] favor based on more than mere speculation, conjecture, or
fantasy.") (internal quotation marks and citation omitted).  As plaintiff adduces no evidence to
support his allegation that Dr. Nolin had the power to admit him to the program, I need not credit
this contention in considering defendants' motion for summary judgment.

Rehabilitative Services. Dr. Nolin, in turn, marked Holloway's application for enrollment in the Intensive program "High priority." Despite their efforts, Holloway was not enrolled in the treatment programs because of their lengthy waiting lists. Similarly, Lisa Jones informed Holloway that the Missouri State Penitentiary could not accept transfers, after Senator Coleman requested that defendants review Holloway's case. Finally, defendants Vicki Myers and Jennifer Sachse reviewed Holloway's complaints about his treatment and his concerns about possible ADA violations, but determined there was no violation.[6]

Defendants' efforts to help Holloway belie his contention that defendants' corrective inaction violated his rights. *See Boyd*, 47 F.3d at 968 (to be liable, "[t]he supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he or she] might see.") (internal quotation marks and citations omitted). That the waiting lists were lengthy is unfortunate, but defendants' inability to enroll Holloway in his requested drug treatment program because of the lengthy wait does not amount to the "unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *See Estelle*, 429 U.S. at 104 (internal quotation marks and citation omitted); *cf. Camberos*, 73 F.3d at 177 (prison nurses not deliberately indifferent to inmate's

---

[6]As is detailed *infra*, there was no ADA violation, and these defendants did not take corrective inaction by reviewing Holloway's letters and responding to his concerns.

medical need for a referral to a shoulder specialist because nurses lacked authority to refer inmate to an outside physician, but took other available steps to ensure inmate was receiving appropriate treatment).

Finally, there is no evidence to support Holloway's assertion that defendants knew or should have known of a risk of serious injury to Holloway because of the delay in enrolling him in the drug treatment program he requested. *See Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 811 (7th Cir. 2000) (prison officials not deliberately indifferent when they failed to administer inmate's antibiotic medication according to physician's instructions because there was no evidence "that any deputy thought missing doses of medication for an ear infection would cause a serious injury"). There is no evidence that any of these defendants had medical expertise in HCV infections or interferon treatment, or knew that a delay in interferon treatment would cause Holloway serious injury.

Holloway asserts that Hudson and Dr. Nolin should have known that Holloway had a serious and immediate need for interferon treatment, because of their medical backgrounds and based on his own descriptions of his illness in the letters he sent them. In addition, Holloway also contends Jones, Sachse, and Myers should have realized his serious need as well, even though Holloway adduces no evidence that they had any medical experience or training. But prison officials are not liable under § 1983 when they lack medical expertise and rely on

the opinion of prison doctors with more medical training about the necessary treatment for an inmate. *Meloy*, 302 F.3d at 849. Here, prison doctors had evaluated Holloway and had determined he was not eligible for interferon treatment based on their observations and the treatment guidelines. Defendants had no basis to challenge that opinion, and they were not deliberately for failing to do so. *See Zentmeyer*, 220 F.3d at 812 (prison officials may not substitute their judgments for a medical professional's opinion). Accordingly, the undisputed evidence shows that none of these defendants violated Holloway's constitutional rights, and they are entitled to qualified immunity. *See Meloy*, 302 F.3d at 849.

### D. Correctional Medical Services

In the second count of his amended complaint, Holloway contends that CMS maintained an unconstitutional policy of denying interferon treatment to inmates with HCV because of their prior drug histories. CMS responds that Holloway failed to plead a § 1983 claim against CMS in his complaint, and that, even if Holloway pleaded his claim against CMS, there is insufficient evidence to establish any violation of Holloway's constitutional rights by CMS.

A corporation acting under color of state law will be held liable under § 1983 for its own unconstitutional policies or customs. *Monell v. Dep't of Soc. Servs*, 436 U.S. 658, 690 (1978); *Sanders v. Sears, Roebuck & Co.*, 984 F.2d 972, 975-76 (8th Cir. 1993); *see also Johnson v. Hamilton*, 452 F.3d 967, 974 (8th Cir.

2006) (plaintiff must show that "there was a policy, custom, or official action that inflicted an actionable injury . . . . "). In determining whether a corporation is liable under § 1983, the "proper test is whether there is a policy, custom or action by those who represent official policy that inflicts injury actionable under § 1983." *Sanders*, 984 F.2d at 976. As with supervisory defendants, corporation are not liable under § 1983 on a respondeat superior theory alone. *Monell*, 436 U.S. at 691; *Sanders*, 984 F.2d at 976. When, as here, a § 1983 plaintiff fails to adduce sufficient evidence of an actionable injury in connection with his medical treatment, his claims against the corporation for its unconstitutional policies or customs also fail. *See Jackson v. Douglas*, 270 Fed. Appx. 462, 463 (8th Cir. 2008) ("Because no constitutional violation occurred in connection with Jackson's medical treatment, Jackson's claims against CMS . . . also fail.").

Although Holloway pleaded a cognizable § 1983 claim, I must grant summary judgment as to CMS because Holloway has failed to adduce sufficient evidence of an injury actionable under § 1983 or of an unconstitutional policy or custom. As previously mentioned, the requirement that injection drug users complete drug treatment before being eligible for interferon treatment was consistent with medical standards at the relevant times. Accordingly, I must grant summary judgment as to defendant CMS, and it will be dismissed from this action. *Jackson*, 270 Fed. Appx. at 463.

## E.  Missouri Department of Corrections

In its motion for summary judgment, MDOC moves to dismiss plaintiff's §
1983 claims against it, because it is not a "person" under § 1983.  This motion is
well taken.  § 1983 provides for an action against a "person" for a violation, under
color of state law, of another's civil rights.  *See* 42 U.S.C. § 1983.  The Supreme
Court has consistently held that "a State is not a 'person' against whom a § 1983
claim for money damages might be asserted."  *Lapides v. Board of Regents*, 535
U.S. 613, 617 (2002); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71
(1989) ("We hold that neither a State nor its officials acting in their official
capacities are 'persons' under § 1983."); *see also Howlett v. Rose*, 496 U.S. 356,
365 (1990) ("*Will* establishes that the State and arms of the State, which have
traditionally enjoyed Eleventh Amendment immunity, are not subject to suit under
§ 1983 in either federal or state court."); *McLean v. Gordon*, 548 F.3d 613, 618
(8th Cir. 2008).  Accordingly, I must dismiss Holloway's § 1983 claims against
MDOC.

## II.  Americans with Disabilities Act Claims

In Count III, Holloway claims that CMS and MDOC violated his rights
under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*
Specifically, he alleges that he is a qualified individual with a disability – his
history of past drug use – and that he was denied interferon treatment because of

that disability.  Defendant CMS responds that this claim must be dismissed

because a lawsuit under the ADA cannot be based on medical treatment decisions.

MDOC agrees that Holloway, as a matter of law, cannot prevail on this claim, and

it also asserts its immunity from suit under the Eleventh Amendment.

Under Title II of the ADA, 42U.S.C. § 12131 *et seq.*, a qualified individual

with a disability may not be excluded from participation in or be denied benefits of

services, programs, or activities of a public entity, or be subjected to

discrimination by that entity, because of the individual's disability.  A qualified

individual with a disability is a person who "meets the essential eligibility

requirements for the receipt of services or the participation in programs or

activities provided by the public entity."  42 U.S.C. § 12131(2).  To prevail on a

Title II ADA claim, a plaintiff must establish: (1) that he is a person with a

disability as defined by statute; (2) that he is otherwise qualified for the benefit in

question; and (3) that he was excluded from the benefit because of discrimination

based upon his disability.  *See* 42 U.S.C. § 12131 *et seq.*; *Randolph v. Rodgers*,

170 F.3d 850, 857 (8th Cir. 1999).

Within the Eighth Circuit, however, claims under the ADA "cannot be

based on medical treatment decisions."  *Burger v. Bloomberg*, 418 F.3d 882, 883

(8th Cir. 2006); *see also Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134,

1144 (10th Cir. 2005) (ADA plaintiff must show that she was "otherwise

qualified" for the treatment she sought, but "the term *otherwise qualified* cannot ordinarily be applied in the comparatively fluid context of medical treatment decisions without distorting its plain meaning.") (internal quotation marks and citations omitted). Accordingly, a plaintiff could not maintain an action under the ADA when the evidence undisputedly showed that plaintiff, who had a history of mental illness, was denied a kidney transplant because of a legitimate medical reason – his mental illness was a contraindication for transplants. *McElroy v. Patient Selection Committee of the Neb. Med. Ctr.*, No. 4:06CV3162, 2007 WL 4180695, at *2, *5 (D. Neb. Nov. 21, 2007), *aff'd per curiam*, No. 07-3877, 2009 WL 50176 (8th Cir. Jan. 9, 2009).

Here, there were legitimate, non-discriminatory reasons for denying Holloway interferon treatment. Specifically, his prior drug use and his history of depression were contraindications to treatment based on the treatment protocols at the time. Defendants examined him on an individualized basis, and treated his HCV by monitoring it and testing it. This does not show discriminatory animus, and Holloway's ADA claim based on defendants' medical treatment decisions must fail. *See Burger*, 418 F.3d at 883; *see also McElroy*, 2009 WL 50176.

Although Holloway is correct that courts have recognized reformed drug users' status as qualified individuals with disabilities within the meaning of Title II, *see* 42 U.S.C. § 12210; *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439

(8th Cir. 2007); *Thompson v. Davis*, 295 F.3d 890, 896 (9th Cir. 2002) (former drug users stated a Title II ADA claim when they alleged that parole officials categorically denied them parole based on their status as former drug users), those cases are distinguishable. Specifically, the plaintiffs in *Thompson* were allegedly denied parole solely on the basis of their status as reformed drug users, even though they met all the other requirements for parole. *Thompson*, 295 F.3d at 894-96. But in this case, Holloway cannot show that he was "otherwise qualified" for interferon treatment, because his status as a reformed drug user was not the only contraindication to treatment – he also had a history of depression and other mental disorders. Accordingly, he was not "otherwise qualified" for the treatment. *See* 42 U.S.C. § 12131 *et seq.*; *Randolph*, 170 F.3d at 857.

Finally, Holloway's assertion that he was denied access to medical care is mistaken. Plaintiffs can prevail on an ADA claim based on prison officials denying them access to medical services at state prisons, *Mason v. Correctional Med. Servs.*, 559 F.3d 880, 886 (8th Cir. 2009) (citation omitted), but Holloway's assertion that he was denied access to medical services is belied by the evidence. It is undisputed that Holloway was treated for his HCV at the hepatitis chronic care clinic, but he was denied his requested form of treatment, interferon, because of contraindications. Just as Holloway's disagreement with defendants' treatment

decisions failed to give rise to a § 1983 claim, his disagreement also fails to give rise to an ADA claim. *See Burger*, 418 F.3d at 883.

Because I determine that MDOC did not violate Holloway's rights under the ADA as a matter of law, I need not decide whether the ADA validly abrogated Missouri's immunity from suit under the Eleventh Amendment. *See United States v. Georgia*, 546 U.S. 151, 159 (2006) (courts must consider whether the ADA abrogated state immunity on a claim-by-claim basis and must determine first "which aspects of the State's alleged conduct violated Title II" before considering whether state is entitled to sovereign immunity); *Zibbell v. Michigan Dep't of Human Servs.*, 313 Fed. Appx. 843, 846-48 (6th Cir. 2009) (holding that courts may consider the question of state immunity "only after finding a viable claim under Title II.") (citation omitted); *see also generally Klinger v. Director, Dep't of Revenue, Mo.*, 455 F.3d 888 (8th Cir. 2006). Accordingly, I must grant CMS's and MDOC's motions for summary judgment as to Holloway's ADA claims.

### III.  Retaliation Claims

Throughout his complaint, Holloway asserts that all defendants denied him proper medical care, including interferon treatment, in retaliation for his complaints, grievances, and lawsuit. He also alleges in Count IV that CMS and MDOC retaliated against him by delaying his transfer, by transferring him to a facility without appropriate medical facilities, and by placing him in

- 35 -

administrative segregation upon his arrival at that facility.  Defendants move for summary judgment on these claims.

## A.  Denial of Medical Care

Prison officials may not retaliate against an inmate for engaging in constitutionally protected activities, such as filing a grievance or instituting litigation.  *Goff v. Burton*, 7 F.3d 734, 736 (8th Cir. 1993); *see also Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1119 (8th Cir. 2007).  When, as here, an inmate alleges defendants retaliated against him by denying him proper medical treatment, the inmate must show that (1) he exercised a constitutionally protected right; (2) prison officials disciplined him; and (3) prison officials disciplined him because he exercised the right.  *See Meuir*, 487 F.3d at 1119 (plaintiff claimed defendants disciplined him by denying him medical care when he refused to visit a dentist).  However, the inmate has a heavy evidentiary burden to make a prima facie case of retaliation, and "[m]erely alleging that an act was retaliatory is insufficient."  *Id.*

Holloway asserts that all defendants denied him proper medical care, including interferon treatment in retaliation for his complaints, grievances, and lawsuit.  Holloway offers no proof to support those allegations, however, except for the fact that he was denied interferon treatment until he completed a drug treatment program.  As detailed above, however, the record is replete with

evidence that Holloway's treating physicians and nurses determined, after

evaluating him, that he was not eligible for interferon because of his medical

history and contraindications to treatment. There no evidence, except for

Holloway's conclusory assertions, to show that defendants denied him interferon

in retaliation for his grievances and lawsuit. His allegations of retaliation are

insufficient to survive summary judgment, and defendants' motions for summary

judgment on this ground will be granted.

## B. Transfer and Administrative Segregation

Holloway next asserts that CMS and MDOC retaliated against him by

transferring him to another facility, and by placing him in administrative

segregation after he filed grievances and this lawsuit. As a general rule, the Due

Process clause does not protect a "duly convicted prisoner against transfer from

one institution to another within the state prison system." *Olim v. Wakinekona*,

461 U.S. 238, 245 (1983) (internal quotation marks and citation omitted); *accord*

*Murphy v. Missouri Dep't of Corr.*, 769 F.2d 502, 503 (8th Cir. 1985) (inmates

enjoy no constitutional right to remain in a particular institution and are generally

not entitled to due process protections before transfer). However, an inmate

"cannot be transferred in retaliation for a constitutional right." *Goff*, 7 F.3d at 737;

*see also Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996) (plaintiff can prevail

on claim of retaliation if prison officials retaliated by denying plaintiff

"expeditious" transfer). When an inmate alleges he was transferred in retaliation for exercising a protected right, he faces a substantial burden of showing that a defendant's actual motivation for the transfer was impermissible retaliation. *Id.*; *accord Ponchik v. Bogan*, 929 F.2d 419, 420 (8th Cir. 1991) (summary judgment on inmate's retaliatory transfer claim when inmate failed to prove that transfer would not have been made "but for" prisoner's protected activities, even though retaliation was "clearly a factor" in defendant's requesting inmate's transfer).

In this case, Holloway first contends that defendants retaliated against him by delaying his transfer to an institution with proper medical facilities, and by initially transferring him to an instituion without those facilities. The evidence reveals that Holloway filed an inmate grievance based on the denial of interferon treatment in December 2005. On February 8, 2006, Dr. Williams changed Holloway's medical classification level from M-2 to M-4, after Dr. Williams determined that Holloway was eligible for interferon treatment based on the newly revised FBOP guidelines. The change in Holloway's classification level necessitated a transfer to a different institution with proper medical facilities, but Holloway was not transferred until ten months later, in December 2006.

Although an inmate can state a claim for retaliation if prison officials retaliate against him by delaying his transfer, *see Babcock*, 102 F.3d at 275, there is no evidence supporting Holloway's assertion that CMS or MDOC would have

immediately transferred Holloway but for his filing his grievance. *Cf. Goff*, 7 F.3d at 737. Indeed, the undisputed evidence reveals that inmate transfers within the MDOC can take longer than six months. Holloway presents no evidence of defendants' unlawful motive in delaying the transfer, aside from the fact that there was a delay. This is insufficient to overcome the "heavy burden" of proving that, but for Holloway's grievance, he would have been immediately transferred. *See Ponchik*, 929 F.2d at 420.

Next, Holloway contends defendants retaliated against him by transferring him to a facility without proper medical facilities. As support, Holloway points to the fact that he was transferred to the WMCC soon after filing this lawsuit, and that defendant Jennifer Sachse "approved" the transfer. The evidence refutes this claim.

The record reveals that Holloway was transferred to the Western Missouri Correctional Center in December 2006. All the evidence shows that Holloway was transferred for medical reasons – the change in his classification from M-2 to M-4. Indeed, his transfer request form indicates he was transferred "for medical needs." WMCC did not have proper medical facilities for an inmate with an M-4 classification like Holloway's, but the evidence reveals that Holloway was mistakenly sent to WMCC, instead of Farmington, and that defendants transferred him to Farmington soon after discovering the mistake. Specifically, one of

Holloway's treating physicians at WMCC, a non-party to this case, discovered that Holloway needed to be sent to another facility after the physician saw Holloway for a health check up in January 2007. That same day, another non-party requested Holloway's transfer to Farmington, and Holloway was transferred there in February. Finally, it is undisputed that transfers within the MDOC system require the approval of several persons, and that defendant Sachse was one of several people who approved his transfer, after it was requested by a non-party to this lawsuit.

None of this evidence shows that defendants transferred Holloway to the incorrect facility as retaliation for his lawsuit and grievances. Plaintiffs have a heavy burden in showing that retaliation was the but-for cause of their transfer, and Holloway has failed to satisfy that burden. *See Goff*, 7 F.3d at 737-38; *see also Graham v. McBride*, 74 F.3d 1242 (7th Cir. 1996) (unpublished table decision), *available at* 1996 WL 19240, at *1 (inmate failed to state a claim of retaliation when defendant mistakenly thought inmate was required to take urinalysis test, and sanctioned inmate after inmate refused to take the test).

Finally, Holloway claims defendants retaliated against him by placing him in administrative segregation upon his arrival at WMCC. This claim also fails. Prison officials may not retaliate against an inmate by placing him in administrative segregation for exercising a protected right, *see Goff*, 73d at 738,

but an inmate must present evidence that he was segregated for retaliatory purposes to prevail on his claim. *Griggs v. Norris*, 297 Fed. Appx. 553, 555 (8th Cir. 2008). Here, Holloway presents no such evidence, aside from his own unsupported assertions. In fact, Holloway admitted at his own deposition that he asked to be placed in administrative segregation upon his arrival at WMCC because he and another inmate at the facility did not get along. This evidence does not support his retaliation claim, and summary judgment must be granted to defendants.

### IV. Holloway's Motion for Fees and Costs

After Holloway's death, his appointed counsel filed ex parte motions to withdraw and for recovery of attorney's fees of $5000 and for reimbursement of out-of-pocket expenses of $11,794.71, to be paid to the Polsinelli Shughart PC, pursuant to Local Rule 83-12.03. Although out-of-pocket expenses in this case exceed $5000, I will only grant the normal maximum of $5000. I will approve a total of $10,000 in fees and expenses.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' motions for summary judgment [#90, #95] are granted, and plaintiff's first amended complaint is dismissed without prejudice.

**IT IS FURTHER ORDERED** that plaintiff's motion for sanctions [#105] is denied.

**IT IS FURTHER ORDERED** that the ex parte request for attorney's fees and costs filed by attorney Scot J. Seabaugh [#115] is granted in part and denied in part according to Local Rule 83-12.03 and the Administrative Order of this Court, and that the Clerk of the Court shall pay Polsinelli Shughart PC the sum of $5000 for attorney's fees and the sum of $5000 as reimbursement for out-of-pocket expenses, as set forth in the separate order entered this date approving disbursements from the non-appropriated fund.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of March, 2010.